Case No. 16-7051, Budha Ismail Jam et al. Appellant v. International Finance Corporation. Mr. Hertz for the appellant, Mr. Vasquez for the appellee. Thank you, Mr. Chairman. Good morning, Mr. Hertz. Good morning, Your Honor. And may it please the Court, I'm Richard Lawrence Hertz on behalf of the appellants. I'd like to reserve three minutes. The IFC is not immune under the circumstances of this case, both because the International Organizations Immunities Act does not provide them immunity here, and because they've waived any immunity they might have. The International Organizations Immunities Act provides the IFC only the same immunity as is enjoyed by foreign sovereigns. What IFC wants here is immunity even from its commercial activities, and that's a form of immunity that all three branches of the government have rejected for decades for foreign sovereigns. Your problem with your statement, you know as well as we do, that you said that foreign sovereigns, applying foreign sovereigns today rather than at the time the statute was passed. Correct, Your Honor. And that's your first issue in the case. Right, we have our two issues. I think that Atkinson, which both Judge Silverman and Judge Edwards sat on, is blatantly wrong and we should ignore it. I think that what the Court has to look to first is subsequent Supreme Court authority. Right. And so, and under that authority, there is no immunity. It's a very interesting argument that you make concerning subsequent Supreme Court cases. None of the subsequent Supreme Court cases deal with the actual legislation passed. And what date was it, 1948? Five. Forty-five. 1945, dealing with international organizations. That's correct, Your Honor. So none of the cases try to interpret that statute. That's correct, Your Honor. So we have tried to interpret that statute and have reached an opinion which has been affirmed by various courts, various panels of this Court, right? That's correct. And I might explain why that doesn't act, why those cases are still directly out there. Your Honor, what I'm pointing out is even if the Supreme Court had concluded that a more dynamic notion of foreign sovereign immunity applied to foreign sovereigns, that doesn't necessarily affect the meaning of the statute passed in 1945. There's two questions. You're saying because one element of the construction of that statute may be different in the Supreme Court. The whole construction of the statute fails. I don't think that's... Is that your argument? No. What we're saying, Your Honor, is that Atkinson is based on two propositions. The first proposition is that when you read the as is enjoyed clause, that means as immunity was in 1945. The second proposition is, well, what was immunity in 1945? And Atkinson said it was absolute. But that's your key. But the real key, what I'm trying to say, is the interpretation of the statute. And the statute goes on to consider the legislative history of that statute. And concluded that since that statute provided specifically for a safety valve the president could change, it froze the immunity of the international organizations as of 1945. It also said the legislative history of the statute included that Congress had explicitly considered a commercial exception and rejected it. So, in other words, what your effort is to do is focus on one of the premises, one of the factors that led into the statutory interpretation. But you're not realizing that the statutory interpretation is broader. No, Your Honor. I disagree with that. And let me explain why. So there's two pieces. I will address the substance of what you just said, but the first point is that even if we accept for the moment that we're looking to 1945, then you look at the five Supreme Court cases that have been decided since Atkinson that say that immunity in 1945 was not absolute. And what happened, what immunity was in 1945, and this is very clear particularly in Sanantar and in Altman, is that the first thing, it's all deference to the political judgments of the political branches. So the first thing is you look, is there a suggestion of immunity by the State Department? But hasn't the government asserted immunity by enacting the IOIA? Can't we just say that is an assertion of immunity that Congress enacted it and the president signed it? And so to the extent you're looking at an immunity that depends on political choice, a categorical political choice was made. No, Your Honor, because what the statute does not say that international organizations are entitled to absolute immunity. It actually doesn't say they're entitled to any particular immunity at all. The plain language of the statute is that they get the same immunity as states. So the question then, assuming we're looking to what it was in 1945 is, assuming that part, which we don't agree, but assuming that, then the question is what was immunity in 1945? And in 1945, there was no substantive standard of immunity. It was entirely deference to whatever the political judgment was. That's why we concluded, we started with a statement virtually absolute and then concluded absolute because it was obvious that in every case, the State Department came in and said it was a great immunity with one exception. And what was that one exception? Hoffman. The Mexico case, right? Republic of Mexico versus Hoffman. And guess what? That was a case where Mexico improperly asserted immunity because it was claiming immunity over a ship that it did not own. I mean, it had license and did not operate. But, Your Honor, that was a case against the Republic of Mexico. It only became a case against the Republic of Mexico in the Supreme Court. The case was originally brought against the ship. And then Mexico intervened and said, we own that ship. And they said, tough luck, you gave it away, you licensed it, and it was gone. So that's the only case you could ever find where the government said no immunity. But the point is, at the time Atkinson's was decided, that is a reasonable, could be, we disagree with it, but it could be a reasonable interpretation of Hoffman. But that interpretation is foreclosed by Samantar. Because what the court said in Samantar was that there was a two-step process. The first step is, is there a suggestion of immunity? There's no suggestion of immunity here. So you go to the second step. And the second step is, is there a policy in the State Department? We're talking about 1945, remember? Excuse me? We're talking about 1945? Yes. That's what Samantar said the approach was in 1945. So the second step would be, and this is what they did in Hoffman, is there a policy favoring immunity here? And it was essentially a rule of deference to no immunity. Because remember, Mexico wasn't even sued in the case. No, I'm saying what the rule was that they applied. So we asserted that it was virtually absolute. But I'm trying to tell you, that doesn't really matter. Even if we got that wrong, which I don't think we did, we are interpreting the statute. No, because the statute, we conclude maybe the Congress got it wrong. But it's a question of what Congress meant in 1945. It's a question of, well, what Congress meant is whatever the law is in 1945. And Altman tells us that once you... But we use legislative history, too. So let me turn... What you do not counter is that Congress in 1945 put in the safety valve. Right. Let me turn to the legislative history part of that. What the court said was not on the side of what was immunity in 1945, but on the side of do we look to 1945 or do we look to now? What the court said was, and let me... Which court? This court in Atkinson. What the court said, and let me get the language exactly right, is that the as-is-enjoyed provision provides, quote, no express guidance. And so what Your Honor did is look to indications of legislative intent. Our position is... Structure of the statute is always the most important thing. No. Plain text is the most important thing, and that's where I'm going here. There is no difference between structure of the statute and plain text. What the Supreme Court has said since Atkinson is that when you have a jurisdictional statute that's expressed in the present tense, because jurisdiction is always decided as of the time of suit, that when you have such a statute and the IOIA is such a statute, you have to apply the law existing as of the time of suit. And in Altman, the Supreme Court said basically the same thing about immunity statutes, that because immunity always looks to immunity as it stands today, that you apply an immunity statute as of the time of suit. Well, we have continued to apply Atkinson over and over and over in this court, right? Even after a number of your cases which you rely on in the Supreme Court. But none of this court's cases ever considered any of those cases. They're just not mentioned. It doesn't matter. It doesn't matter. It doesn't matter. We are bound by our court, by our decisions. No, Your Honor, because the case we rely on most heavily for that is Your Honor's decision in Dellums v. Nuclear Regulatory Commission, where Your Honor said for the court that where subsequent Supreme Court authority has undermined a decision of this court, undermined the rationale of a decision of this court, it's simply not binding. It's not followed anymore. Well, yes, yes, but there's a question of time. If you have a Supreme Court case that undermines our prior opinion, we are at liberty to change our position. I would suggest we have to change it. If after that Supreme Court case comes down, we continue to apply our law, then that argument is gone. Do you understand what I mean? I don't agree with it. I understand your point. You don't like it. No, I think it's mistaken, Your Honor. No, I don't think it is. When a court continues to apply a position which you think was undermined earlier by a Supreme Court case, you have to assume that our court concluded otherwise and continue to apply the law of the circuit. The court reached its decision in Atkinson. Do you understand the point I made? I do, Your Honor, but what I'm suggesting is just the simple proposition that the Supreme Court sets the rules. If there's an inconsistency between what this court says and what the Supreme Court says The Supreme Court gets to set the rules. You're right. But if we conclude otherwise, then it's the law of the circuit that we're bound to apply. Yes, but the point I was alluding to earlier is that this court has never considered Atkinson or the scope of international law. That argument is not available. If the court has subsequently taken a position which you think is inappropriate in light of Supreme Court cases, it doesn't matter. Then it's the law of the circuit that binds. You can't go back and say, well, you made a mistake because the Supreme Court... This is even assuming you were right. I think you're wrong about your interpretation of 45. I'm trying to tell you what we're bound by. We're bound by the law of the circuit. Now, to be sure, if after a case of the circuit comes down, the Supreme Court comes down with an opinion which undermines that, it is open to the circuit to change its position. But if the circuit afterwards does not change its position, then we're bound by the law of the circuit. Well, with respect, John, I don't believe that can possibly be correct. In particular, in the case after Atkinson, not only wasn't this issue ever presented, all they said was... It doesn't matter. With respect, Leon, I think at the end of the day, the court has to follow what the Supreme Court says. That proposition, of course, is true. And that's where we... I think you understand the point at the outset, which is even if you were right about the law in 1945, it doesn't matter, because we were interpreting the statute, and the Supreme Court never has said that our interpretation of the statute was wrong. No, I disagree with that as well, Your Honor, because there are two independent questions in Atkinson. The first question is, what time frame are we looking at? And the second independent question is, okay, assume, we'll assume for the moment that we're looking at 1945. What was the law in 1945? And the Supreme Court has said five times since Atkinson that it simply was not an absolute meaning. In other words, you're not focusing on what the statute means. No, well, it's a separate argument. We only have to win one of those arguments. Oh, yes, you have to win the statutory argument. No, because if I agree with you that you can look to 1945... No, no, no. But the statutory argument is that the structure of the statute providing for a safety valve on the part of the president means that Congress wanted to freeze it as of 1945, even if you were right that Congress was wrong about how to freeze it. Do you understand the point? I'm sorry, I don't think I do. I don't think you do either. I'm sorry. Go ahead. I mean, our court in Niambal has said much more recently that it doesn't think that the intervening Supreme Court cases displace Atkinson. I don't think that's correct. What the court said in Niambal was, so the Third Circuit came down with an opinion in the Calva and disagreed with Atkinson. And the argument in Niambal was, well, there's this Third Circuit case. And in that case, you know, the paddle's bound. I agree with that. But what wasn't presented in Niambal was the five Supreme Court cases that say immunity in 1945 was not absolute. And the Dole case, which says that when you read a jurisdictional statute that's written in the present tense, you have to apply it as of the time of suit. And that is a plain language. That is what the Supreme Court has told us is the plain language reading of a jurisdictional statute. And that's why, Your Honor, when in Atkinson the court said, you know, we're looking for indications of legislative intent, that may have been fine, but you don't get to that step because now the Supreme Court has told us what the plain language of the as-is-enjoyed statute is. And that's what the court said in Atkinson. There was no express guidance on it. And now there is in the Dole case and in the Altman case, which also says that immunity statutes are decided as of the time of suit. And so we have a plain language, a plain text guidance from the Supreme Court about how to read that provision of the IOIA. And so there's no reason to go beyond that to look to indications of legislative intent. Your Honor, this is a practical matter. If we were ever to agree with you, the Supreme Court would take the case in reverse 9-0. I think we are based—I don't see how it could— That is my prediction. I can just imagine what would happen if all these international organizations were subject to your notion of lawsuits. Well, so in a sense, that's a policy argument, Your Honor. No, no, that's why. We don't do policy. We do law. We do law. But the Supreme Court does policy. Well, but in this case, the statute after Dole and in light of the five Supreme Court cases is clear. No, I'm not teasing. You know, even if, Your Honors, we have a wholly separate argument here under Mandara. I understand. You want to go to the waiver issue? Yeah, I mean, look. So this Court has said a number of times that the institution needs the trust of a third party. Like in Villa, they needed the trust of a consultant. And they said that helps the IFC's mission. But in this case, you know, Mr. Jam is a subsistence fisherman whose livelihood was destroyed by the IFC's project. That isn't just help. A suit by him isn't just, his trust isn't just helpful to the IFC. That is the IFC's mission. Your Honor, what a nightmare for the organization would be created by our concluding there's a waiver here. Your Honor, the problem is. Every time they authorized a loan, they would be faced with liability from the ultimate beneficials. No, Your Honor. So there have only been 10 cases out of the 5,000 projects that have gone through the IFC. Only 10 of them have gone through the IFC's compliance mechanism. Had the IFC, had the compliance mechanism say that they were out of compliance and have the IFC. Yeah, give an opening, though, for class actions. No, but. I'm sorry. The point. I'm trying to say what would happen to the organizations. The point is that the organizations would actually follow their own policy. What the IFC is saying here is that it is not in their interest to follow their own policy. And our only point is that that can't be right. It's quite odd for us to be, though, in the position of determining what's in the IFC's interest. I mean, I just find the Mandara test to be very strange. It puts us in a strange position. I agree with you. I think that Judge Berger was right in speaking for this court in Lutcher when he said that the plain text of this waiver provision means that there's waiver. Wilkie was wrong. Have communities. Wilkie was wrong. Isn't that right? I mean, that's what the court said in Lutcher. And, you know, judging by your honors. You made the argument that Mandara was incorrect because it didn't follow the earlier opinion. Right. That's right. It didn't follow Lutcher. And that's the point that you were making to me about how bound the court is to Atkinson. And if your honor believes that, then we're back in Lutcher because Mandara overturned Lutcher. It never should have. It didn't have authority to do that. There was no intervening state authority. It's a strange interpretation. They didn't overturn it. Well, I think they're fundamentally inconsistent. Lutcher says, you know, we have a clear waiver provision that says they're waiving immunity for all suits except for suits by members of the bank. And Mandara adopts a test. And it's exactly the sort of test that Lutcher specifically said, that's not the road we're going down. So we have Mandara. And you're saying we should make a determination that it is in the interest of the bank. And I guess there's some dynamic questions here, whether even though there have been only a few cases to go through the internal process, presumably if this were thrown open, there would be a lot more cases that would go through the internal process. Also, this is a project that was funded by many different entities. Are there other cases pending against any of the other funders? They're all foreign entities. It's an Indian conglomerate. Are there cases pending in India? I don't specifically know if there's cases pending in India right now. India is, you know, it's very clear to our clients that India is not going to give them, particularly against this company, there's not going to be an effective remedy in India. And it's very clear that there's no effective remedy for the IFC to actually enforce its own policies in this case. So remember, IFC has control here. They wrote into their contract that their policies have to be followed. And so they could step in at any time and say, you know, you have to do what we've been promising would be done. But they say that they're not going to do that. In fact, here they say that our promises, the ones that we say are central to our mission to protect people like Mr. Jam, just aren't really that important, that they're not even part of our mission at all. And that's precisely why IFC needs cases like this because they are denying what IFC management in this particular case is denying exactly the policies that IFC itself says it cannot perform its mission without. And so the question is how can IFC perform its mission if IFC management is going to say these policies don't matter in individual cases and there's no lawsuit to make them do it? And so I don't think the court has to make a judgment about what's in IFC's best interest. I think the IFC has already made that judgment. They've said time and again that hurting people like Mr. Jam or not protecting people like Mr. Jam is fundamentally – They've made that judgment against a backdrop of international organizational immunity and saying we will as an aspirational matter, we will as a not judicially enforceable matter, we will promise these things and here's our mechanism. It's a soft law mechanism. It's an internal mechanism that we ultimately control. And that's what our promise means. Why is that not the case? Because the decision they made and these sorts of things are not just made by management. They go through the board. They go through outside consultation. The decision they made is that we cannot perform our development mission unless these safeguard policies are rigorously enforced. And so to now say that – and it was not made against the backdrop of the fact that the compliance mechanism existed. It was made as a judgment about what it takes for them to fulfill their mission. And so for the IFC or IFC management to now say when the IFC through this consultative process and through the board, it made these statements that this is what development requires for management to now say that's not true. These policies just aren't that important to us only highlights why the only recourse, the only way to make IFC actually do what IFC itself says is fundamental to its mission is through waiver. And so, I mean, the other aspect about this is that one of the policies is that the IFC, before it can even take a project to its board for approval, IFC has to get broad community support. And so put yourself in the position of somebody like – and that means that, you know, people trust them when they say, we will protect you. And so this is a much stronger case than VILA where it was just a contractor. So put yourself in the position of somebody like Mr. Jam and his community who – or a hypothetical Mr. Jam in the future who's facing a project like this. And when the IFC comes in here and says that, well, we don't think these policies are really all that important, somebody like Mr. Jam who's afraid that this project is going to destroy his livelihood, that it's going to destroy his children's future, there is no way that person and that community is going to give broad community support. And that stops the project unless they say, as they did here, that we're just not going to follow our broad community support requirement. And so the only way – They didn't care whether they got broad community support. They did not get broad community support from the – They'll just continue operating that way. I mean, that's ultimately their decision on what kind of organization they want to be. No, the entire point of the waiver provision is that there's waiver when it's in the organization's best interest. And they have told us that they cannot perform their mission. They've spoken out of two sides of their mouths. No, they've spoken out of one side of their mouth. Until they got it to court. And then management spoke out of a different side of its mouth. But management is never going to want to be sued. You've got to go by what the IFC itself says is the IFC's mission and what it needs to perform its mission. But you understand what an odd position this puts us in, right? I mean, it's our own court that put us in that position. It's not you. I understand that. But, you know, it's in the IFC board or the member states should be coming in and saying to management, don't mess around with our project this way. But they haven't done that. I mean, I think the court has to take this, you know, as it lies. And as it lies now, just go with what the IFC says it needs to do to perform its mission. And if the court does that and then thinks about whether somebody like Mr. Jim would ever in a million years risk his children's future that the IFC will fulfill their policies when they haven't done it here and they deny here that their policies even matter, they just can't go forward with high-risk projects anymore unless there's some mechanism in which they're forced to follow their own policies. Thank you. Thank you, Your Honor. Mr. Vasquez. May it please the Court. You can raise the whole thing if you're going to be that tall. Thank you, Your Honor. My name is Frank Vasquez, and I'm joined at council table by Maxwell Hyman, and we're here on behalf of IFC. Good afternoon. As we've been discussing, the plaintiffs in this appeal have attacked the district court's decision in essentially two ways. First, as to the overall methodology and interpretation of the IOIA, and they contend that the Atkinson case is no longer good law. And then, second, they've attacked the district court's analysis under the Mindaro test as to whether IFC should be immune in this particular lawsuit and other lawsuits that could potentially arise from the actions of the compliance advisor ombudsman, also known as the CAO. Going to the first argument, as I gathered from the Court's questions to Mr. Herz, this Court continues to believe that Atkinson remains vigorous law, as Judge Brown wrote in the Nyambol case in 2014. The IOIA and the FSIA are, in fact, two separate statutory frameworks designed to work in two different ways for two different groups of potential defendants. And I think, as Judge Silverman noted, actually only two of the cases the plaintiffs rely upon as supposedly overturning Atkinson, which were Bank Markazi cited at their brief at page 26 and Harani cited at their brief at page 28. Only those two cases were decided after Nyambol, and none of them has anything to do with the IOIA. So as the District Court held, we do not see any reason to depart from the established law in this circuit. Now, addressing the argument specific to IFC and the CAO, what the Mindaro analysis comes down to is whether Just before you get on to the Mindaro analysis, it is odd that we have a statute that says give international organizations the same immunity as is enjoyed by foreign sovereigns. And they don't have the same immunity as is enjoyed by foreign sovereigns. They have a much broader, more categorical immunity. There's no commercial activities exception. There's no direct effects exception. I mean, that's just looking at it afresh. I understand that we have Atkinson and Nyambol on the books, but if you were looking at that today, how would you justify having more immunity for international organizations than for foreign states? Well, actually, the international organizations still start with complete immunity, and the way that that statute works is then you need to look at the exceptions to see whether any of those apply in a particular case. But if you look at, I believe it's 28 U.S.C. Section 1603, they have immunity. But here, for example, the plaintiffs have said you make no claim that this is not commercial activity. If it were under an FSIA-type analysis, this is commercial activity and there would not be immunity. Do you dispute that? Have you disputed that in this case? We would dispute that for a couple of reasons. First, our claim sounded in tort. But torts can arise out of commercial activity, no? Potentially, but this, and the question is whose activity? Yes, loaning money is a commercial activity, but the kinds of things that they're complaining about in India are activities of a different party. And so there is a requirement, and I've litigated this, that it be an act of the foreign state, that the commercial activity not just be any commercial activity, but the commercial act has to be of the foreign state. There's a case called Velasco in the Fourth Circuit that I argued, and another one called Phaneuf, P-H-A-N-E-U-F. That's in the Ninth Circuit. They both deal with this issue where plaintiffs attempted to sue a sovereign based on fraudulent activity that rogue employees used the indicia of authority from the sovereign to do things that were illegal. And the courts held in those cases that you can't just say any commercial activity. It has to be a commercial activity of the foreign state. I do not wish to add to your response to the question that Congress in 1945 explicitly considered and rejected an exception for commercial activity. That's correct, Your Honor. They did do that. Or the international organizations. That's correct. They looked at this. Well, that's in response to my colleague's question as to why would there be a distinction. Yes, that's correct, Your Honor. These are two separate frameworks, and they're designed to work in two separate distinct ways. The IOIA framework gives the absolute immunity and has the executive order, which decides not only who gets it, but also whether there's limitations on it, and that executive order can be modified from time to time. If your organization decided to start a chain of pizza parlors in the East Coast to fund some of its activities, what would be the response? Well, I don't think you'd get – One thing, the president would then have the capacity to eliminate or modify your sovereign immunity. That's correct. The executive could come in and say those pizza parlors are not subject to immunity. So the U.S. executive can remove the immunity of an international organization? How does that work? There are two separate protections for international organizations. We need to recall that the agreements that they enter into – here are the articles of agreement for IFC and the various charters for all these international organizations. Those are treaties. Those are United States treaties enshrined in law. Right. And that's where that waiver language that Lutcher uses is found. Yeah, so these things have to be interpreted together. So, for example, if the executive were to do something that violated the treaty, then you'd have a different issue. That's what I'm saying. How could one sovereign's executive waive the international organization's immunity to the extent that it's intact under its treaty? It could not. Okay, so it can't. I mean, you'd go – Well, now, wait a minute. So what is the waiverability of the executive? What is the capacity of the president? I thought my understanding of the briefing is the president could modify the immunity. Yes, yes, if it's consistent with the treaty. And in this case, it would be in your piece of – Yes, okay, that's what you're saying. How so? How would it be consistent with the treaty? Because the way this has been interpreted here is that if you read that – I guess it's Article 6, Section 3 of the Articles of Agreement. It talks about being able to sue where the entity – where the IFC has an office in that country, in those countries' courts. And that's been interpreted around that. So the president could authorize a suit for that under the way the articles are structured here. For instance, what the president could not do, for example, is tax IFC because there's a specific provision there against taxation that's separate and apart from the immunity that we're talking about to be sued. So there is a way to interpret this. I also would want to point out, and this case is not cited in the briefs, but what does – how does this court view these international organizations when they're not – when the U.S. is not involved? And there is a case that the court decided it's Abbas versus foreign – I'm sorry, that's not the right case. It's Freedom Watch versus OPEC, cited at 766 F3rd 74 in 2014. And the issue there was what is OPEC? Is it a sovereign entity that qualifies for foreign sovereign immunity? I know the Foreign Sovereign Immunities Act is one of those. Or is it something else? And the court determined it's not in those circumstances. It is an unincorporated international association. So absent the executive issuing an order designating somebody as entitled to IOI immunity, they wouldn't get it. They would have to go through – they would be treated as something different. So, Mr. Vasquez, under Mandara, which I've expressed some skepticism about that as a task that we as a court relish. But nonetheless, the precedent gives us the task of deciding whether it is in the organization's interest or not to be susceptible to suit in U.S. courts. And it does seem that there's a lot that the plaintiffs have pointed to in this case that makes it seem like it is susceptible. It is in the interest of the IFC to have enforceable obligations to carry out the undertakings that it itself has said it would adhere to. What's your response to that? Our response is that it would open up floodgates to all kinds of lawsuits if every single policy that the IFC ever issued was – Is that a legal argument? It would open up floodgates. We're not rewriting the law. We're not rewriting the test. We're saying – That's what the lower court said. Okay. And I'm just asking you to respond. So it's not in your interest because you do so many things that are against your stated commitments that you would be subject to suit everywhere? Well, I mean, we agree that what the district court found is that a waiver of immunity for CAO-related cases would not advance IFC's chartered objectives, which is the law, but would impair them substantially. And that it would open up a floodgate of lawsuits from aggrieved complaints all over the world. And the district court also found that there's little reason to doubt that finding a waiver in CAO-related cases would produce a chilling effect on IFC's capacity and willingness to lend money in developing countries. And that also goes against IFC's chartered objectives. I mean, candidly, that makes sense to me, that if IFC doesn't want to be sued, it's never going to be in IFC's interest. And so that's why I think the Medard test is a very odd test. Nonetheless, it is our circuit's test. If we're going to give it any meaning whatsoever, when does it allow suit? Why doesn't every suit fall into the argument you're making that it would open a floodgate, that it would make IFC pull back on some of the undertakings that it otherwise more generously extends? Well, I mean, there's also other law that where IFC is subject to suit is when it's got direct lending agreements or direct arrangements in connection with its chartered objectives. Suppose you were building a building to put your boys in, and you contracted with an architect and contracted with a builder and then refused to pay, and you were sued. We would conclude there was no way you could... You might wish to get out of a lawsuit, but we would conclude there was no way you could build buildings and hire architects and therefore do your operations without waiving them. Correct. That's your classic case. Yes. And Mr. Hurst says this is just the same. There's no way that you can get community buy-in on projects in the future if you blow it off this time, just like you're never going to be able to hire an architect if when the architect comes calling, you blow off their bills. Well, that's not true. Because you have the power and the communities don't. Well, as part of reviewing whether to take on a project or loan money to it, they don't actually take a project, they loan money to a project because IFC is forbidden from managing these projects. Right. You agree to fund a project. Yes. It becomes part of your portfolio, so you take it in that sense. Yes. And so the CAO has only been in existence since the year 2000. For the 45 years prior to that, there was no CAO, there was no policies that we're talking about here. IFC had no trouble finding projects, being able to invest in projects, and didn't think that by creating a CAO they were somehow creating an avenue for lawsuits. Right. Probably to the contrary. But I think their position is broader, that they're saying that you do have a public interest mission and you've always had a view of wanting to get the community buy-in where you're going to do essentially development work, right? That predates the CAO. Well, the way IFC is structured is all of these projects have to be approved by a board of directors which represents the countries at issue. So if a country said, we don't want that project in our country, we certainly wouldn't go there and put a project in that country. But this idea of the more sort of finely granular community buy-in, where we're going to cite this project, where does that come from? That is also done at the project level and when IFC investigates what to invest in. Because another thing that is required is that you be in compliance with local law. IFC is not going to invest in projects that are not in compliance with their local law. If you would take advice from an ex-banker, you might respond that if any authorized loan to a project in a country that you would be dealing with, you would find a certain number of people who are against it and a certain number of people who are for it. That's correct. And that's why, as a general proposition, there is no lender liability. That's separate and apart from what we're talking about here. I would, to, I mean, help the court, I think, and I want to enlist Judge Randolph's help. Because I think he said something in a prior case that's useful to this court. And that issue appears on page 58 in our brief. And it goes to some dicta from the O'Sara case. And I argued that case in front of Judge Randolph. He was sitting right where Judge Silverman is, about nine years ago. And he suggested at that time that it would be helpful if organizations like IFC would express a specific desire or as to why they wanted immunity for particular classes of cases. And he put that as dicta in his opinion. And so we prepared this case below to go with that. If you look at the Fadi Zaidan declaration cited at JA 319 and 325, in particular paragraphs 18, 20, 62, and 63, that IFC explains that it did not intend that CAO activities would result in waivers of immunity. It feels that this opening up this class of cases would be very detrimental to IFC and hurt its mission. And what Judge Randolph said there is we ought to give these agencies some form of deference. It would make our job a lot easier as a court if you, international organizations, when presenting your cases, would present that kind of evidence. And so we presented that kind of evidence. And we think this case presents an opportunity for the court to take that dicta and make it into a new precedent or circuit rule. And we invite the court to consider doing that. Is one of the objectives of IFC to do no harm, as the other side alleges? No, that's not part of their chartered objective. And frankly, that's an impossible standard. Well, I'm just asking whether they've adopted the standard. I don't know whether it's impossible or not. The chartered objectives, which I'm talking about here, are in the Articles of Agreement. And they deal with IFC's mission is to loan money to projects in developing countries. Without regard to what the project is and whether it will do any harm in the community? Well, that's how they go through and determine which projects to invest in. And as I said. So there is a do no harm standard that they follow. There is. Well, the components are you need approval from the Board of Directors, including the country at issue. It needs to be lawful within the country. It needs to be developmentally sound. Is there such a statement anywhere? Our projects are limited by the proposition do not harm. No, I don't believe there is. Of course not. Is the conduct alleged here in violation, assuming that it were proved in violation of local law or consistent with local law? We believe it's consistent with local law. We never got that far in this case. They raised the claims of nuisance. We did put in statements from Indian lawyers on the 12B6 aspect of the motion below, who said that their claims should be dismissed under Indian law as well as the other law that they argued. So I don't think they have a claim. We moved to dismiss on the 12B6 basis below. And you don't actually think they have a claim in India either? You've said they should go to India, but you don't think they have a claim in India either? They could bring a claim in India, but our Indian law expert said that their claims are… And you would not assert sovereign immunity against that claim? We don't have sovereign immunity. I mean international organizational immunity, I'm sorry. Yeah, I… There's no IOIA in India, so I don't know how it works, but… You hired an Indian lawyer. Yeah. But you would be unreachable, no doubt, in that case. Would you be reachable, given that there's no… I guess you'd be reachable because of the funding at the project? Your funding is seeking to serve that jurisdiction, presumably under Indian prison jurisdiction law principles. You'd be present there. The IFC would be present there and susceptible to sue. The IFC has an office in India. Yeah, well, you said you weren't there. I'm just trying to understand what your response to my question was, which is, would you be susceptible to suit in India? Were they to bring a nuisance claim, environmental degradation claim, some kind of claim? Why wouldn't you there be asserting immunity of international organization? There is a possibility of asserting claims against IFC in India. Okay. In particular cases, IFC might claim immunity or might not. I'm aware of another case that was in Belgium where the court ruled that you actually can't sue IFC in Belgium because it doesn't have an office there. But you do have an office in India. IFC does have an office in India, so it's possible to sue them there. How far do you go with the waiver? If IFC and the borrower are in colludes and the deal really is corrupt, and IFC is aware that what is about to happen is going to be a disaster, I'm not accusing you of this. I'm just trying to see how far you go. And they don't care. They understand that the building will not be done right, the environment will be destroyed, people will be hurt, and it can be shown. Are they still immune from suit? Suppose a borrower is sued. Can the borrower join in, join IFC in the suit as a co-defendant? Who? Sorry, the borrower? Borrower. Oh, borrower. The borrower probably can sue IFC already because there are extensive agreements between any loan agreement and their suit. Limited to the corrupt situation. There's no question. Somehow this evidence all comes out. They clearly are implicated in the sense that they know what's going to happen, will be a disaster, and they go ahead anyway. I don't think an outside third-party plaintiff could sue IFC directly. What could happen, though, is they could sue the project company on these issues that you've alleged, and then they could be implicated under the agreements that IFC had if there was a matching dispute resolution mechanism that could keep them in the same court or arbitration. Do you think using our Mandaro test that they still would avoid suit? I don't think that a third-party could sue IFC directly in a case like that. Because, well, you're just asserting— And there is a case like that, actually. It's called Banco de Seguros. We've cited it. It's in the Southern District of New York, in which plaintiffs in Uruguay brought a case against IFC on the grounds that IFC had conspired with an Uruguayan bank, and the ruling was IFC was immune from that. You could sue the bank. You could sue—go after people in Uruguay. But in terms of a third party trying to bootstrap and get around that immunity, no, that immunity is preserved in that circumstance, and that's a direct application of Mandaro. Okay. Thank you, Mr. Besswith. Thank you. Mr. Hurds, you sought to reserve time, but you actually used all your time. We'll give you two minutes. So, Your Honor, on waiver, all we're asking is for the court to actually apply the Mandaro test. And what I heard from my colleague is that they want to eviscerate the Mandaro test in two ways. First, they want this court to defer to them, to their view of whether this case will help them. This court has never done that. It's always exercised its own independent judgment, and that's for an obvious reason, because they are always going to come in here and tell you that the sky will fall if they can be sued. And that's why this court has never deferred and should not now defer to what they're telling you will be the effects. What the court should look at is their actual policies, and that provides the answer. The other way they want to eviscerate the Mandaro test is they want it to be that only the borrower, people like the borrower, have waived. But the borrower is in a real position with the IFC. They can put in their contract that there's some sort of remedy if things go south. But our clients were just neighbors. They had no influence over the IFC. There's nowhere for them to turn. There's nothing they could have done beforehand to prevent the IFC from harming them. There was supposed to be, because there was supposed to be a broad community support requirement, but they didn't follow it. What about to the project in India? I'm not sure that there is no such suit, but it is abundantly clear that given the realities of the justice system in India, that that is not a viable. Why? Because it takes forever, because it is seen at least, if not actually seen, as corrupt and in favor of huge conglomerates like Tatamundra. Do you want us to assume that the judiciary in India is corrupt? No, because I think it doesn't matter. There's nothing about either the waiver provision or the IOA under which jurisdiction turns on whether we can sue the conglomerate elsewhere. Maybe we can, maybe we can't, but it's just not a deciding factor. On the question of the timing of the Supreme Court cases, the last decision of this court on the IOA was Niambal. Bank Marchesi, which is a Supreme Court case, came out after that, which also said immunity in 1945 was not absolute. And this panel in Harani also said that immunity in 1945 was not absolute, after Niambal, after Atkinson. And let me just talk for just a second at my last point about the history of this. There's, you know, Mr. Vasquez wanted to portray that there was sort of this background idea of immunity for international organizations. It was actually exactly the opposite. The U.S. government took the position from the beginning in 1945 that international organizations had no immunity. And the organizations came in and said, wait, we're a collection of states. Treat us like states. And so they came out with the International Organizations Immunity Act. And the first draft said, and I'm quoting this, that organizations, quote, shall enjoy immunity from suit. That was stripped out. And instead they put in the provision that said that immunity should be exactly what states get, as is enjoyed by states. They gave, the United States gave international organizations exactly what they asked for. And the Supreme Court has said in cases like Chickasaw Nation that where Congress strips out a provision, in this case an absolute immunity provision, the court shouldn't be trying to read it back in. So the one thing we know about the structure and history of the International Organizations Immunity Act is that it does not afford absolute automatic immunity. If we were to take the case of Humbug, overrule Atkins, give you FSI, Atkinson, get you, I knew as I was saying it, I was saying it wrong, then you, I mean, it would presumably have to be further briefing on commercial exception or direct effects or any exception under the Foreign Sovereign Immunities Act. Potentially, but, Your Honor, they had the chance to raise that in the district court and they didn't, and they had the chance to raise it here and they didn't, and it's squarely presented. Because, you know, the question is, okay, Mr. Hirsch, you're correct, there's a commercial activity exception. If I were in their shoes and I actually believed there was a commercial activity argument, I would have said even if they are right all along the line, you don't win under commercial activity. And, in fact, that's the way this court decided broadband. It said that we don't have to decide the question of what the scope of immunity is because it doesn't matter. There's no commercial activity here. And in Atkinson, the court gave a separate reason that it didn't matter because there was no commercial activity. All right. Thank you. The case is submitted. Thank you, Your Honors.
judges: Pillard, Edwards, Silberman